# EXHIBIT A

## COMMONWEALTH OF MASSACHUSETTS

**MIDDLESEX, ss**                                    **SUPERIOR COURT DEPARTMENT**

                                                                        **OF THE TRIAL COURT**

_____

                                                            )
**ROBERT A. DOANE**                          )
                                                            )
      **Plaintiff,**                             )          **Civil Action No. _____**
                                                            )
**v.**                                                     )
                                                            )          **RECEIVED**
**ADVANCED MARKETING &**           )
**PROCESSING, INC. d/b/a "PROTECT**   )          5/2/2022    HG
**MY CAR"**                                        )
                                                            )
      **Defendant.**                         )
                                                            )
_____)

## COMPLAINT
**(with jury demand endorsed hereon)**

      NOW comes Plaintiff, **ROBERT A. DOANE**, by and through undersigned counsel, and

for his Complaint against Defendant Advanced Marketing Processing, Inc. d/b/a "Protect My

Car" states and avers as follows:

## NATURE OF ACTION

1.     This case involves a scheme by Defendant to generate sales of vehicle service contracts

in Massachusetts in violation of the provisions of the Massachusetts Telemarketing Solicitation

Act, M.G.L. c. 159C (the "MTSA").

2.     Plaintiff brings this action for statutory damages and injunctive relief under the MTSA.

Plaintiff likewise seeks compensatory damages for invasion of privacy in accordance with

M.G.L. c. 214, § 1B, and compensatory, treble damages and attorney fees for violation of the

Massachusetts Consumer Protection Act, M.G.L. c. 93A.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to G.L. c. 212, § 3 because the amount in controversy exceeds Fifty-Thousand Dollars ($50,000).

4.      This Court may exercise personal jurisdiction over the Defendant in accordance with M.G.L. c. 223A, §3(a), (b), (c) and (d) as Defendant has transacted business in the Commonwealth of Massachusetts, contracted to supply services and things in this Commonwealth, caused tortious injury by acts or omissions in this Commonwealth and caused tortious injury in this Commonwealth by acts and omissions outside of the Commonwealth at times the Defendant has regularly solicited business in this Commonwealth.

5.      This Court also likewise has personal jurisdiction over Defendant for those claims arising under the MTSA, because "[a] court of the Commonwealth may exercise personal jurisdiction over a nonresident or his executor or administrator as to an action or proceeding authorized by [M.G.L. c. 159C § 12]."

6.       Venue is proper in this Court pursuant to M.G.L. c. 223, § 1 because Plaintiff has a residence in Middlesex County and a substantial part of the events or omissions on which the claims are based occurred in Middlesex County.

## THE PARTIES

7.      Plaintiff, Robert A. Doane ("Plaintiff"), is an individual with a residence at 103 Prospect Street, Wakefield, Massachusetts 01880.

8.      Defendant Advanced Marketing Processing Inc. d/b/a "Protect My Car" ("Defendant"), was at all times relevant a corporation organized under the laws of Florida, with its principal office located at 570 Carillon Parkway, Suite 300, Saint Petersburg, Florida 33716.

9.      Whenever in this Complaint it is alleged that the Defendant committed any act or

omission, it is meant that the Defendant's officers, directors, agents, servants, or employees,

subsidiaries, or affiliates committed such act or omission and that at the time such act or

omission was committed, it was done with the full authorization, ratification or approval of the

Defendant or was done in the routine normal course and scope of employment of the

Defendant's officers, directors, principals, agents, servants, or employees.

### STATEMENT OF OPERATIVE FACTS

**Defendant's Operations**

10.     At all relevant times, Defendant was engaged in the business of promoting, marketing

and selling vehicle service contracts ("VSC") to Massachusetts consumers.

11.     At all relevant times, in order to generate leads for Defendant's benefit, Defendant

utilized agent overseas telemarketers (the "Telemarketers") to contact Massachusetts consumers

by telephone, utilizing prerecorded messages and caller-ID spoofing (a process that displaces the

actual caller identification with a fake local caller identification) and automatic telephone dialing

systems.

12.     Plaintiff states upon information and belief that during the course of Defendant's

marketing campaigns, the Telemarketers, at Defendant's direction and with Defendant's

knowledge and assent, utilize fictitious company names in order to avoid exposure to Defendant

by consumers related to unwanted telemarketing calls.

13.     At no point has either the Defendant or the Telemarketers been registered with the

Massachusetts Office of Consumer Affairs and Business Regulations as required by 201 C.M.R.

§ 12.04.

14.     At all times relevant, including but not limited to May, 2019, Defendant had control over the Telemarketers' actions on its behalf.  For example:

        a.      Defendant limited the type of consumers the Telemarketers could solicit and the manner in which a consumers could be "qualified".

        b.      Defendant restricted the geographical area within which the Telemarketers could solicit business as part of each campaign.

        c.      Defendant authorized and directed the use of prerecorded messages.

        d.      Defendant was involved in drafting and authorizing the script the Telemarketers used to solicit business on Defendant's behalf.

        e.      Defendant instructed the Telemarketers with respect to the volume of telemarketing calls and the methods to be utilized in placing the calls.

        f.      Defendant had day-to-day control over the Telemarketers' actions, including the ability to prohibit the Telemarketers from using an ATDS, illegal spoofing, the use of prerecorded messages and other illegal methods to contact potential customers.

15.     Although Defendant either knew or should have known of the provisions of the MTSA, Defendant, at all relevant times, directed its Telemarketers to generate leads by using methods that violate the substantive provisions of the MTSA.

16.     The calls placed to Plaintiff complained of herein were within the scope of the Telemarketers' job duties and the actual or apparent authority provided to the Telemarketers by Defendant.

17.     At all relevant times, the Defendant profited from the Telemarketers' aforementioned efforts and ratified the actions of the Telemarketers by knowingly accepting the benefits of the Telemarketers' illegal activities.

18.     As a result of Defendant's illegal telemarketing practices, Defendant has received

hundreds of consumer complaints including the following made to the Better Business Bureau[1]:

08/20/2020
This company continutes(sic) to call me - many time per day. I have asked to opn the do not call list many time and ignored. Calling multiple time per day.

06/29/2020
Called an asked them to stop calling me and received some canned response about them not making outbound calls. They may have another company make the outbound call for them so they can say it wasn't us who called. Duh, just need the calls to stop. Not interested.

06/24/2020
I received a call from a 701 number. That is a spoofed number. I am on the national do not call list. I received a call from a 701 number on 6/24/20. That is a spoofed number. When I answered there was nobody on the other end of the line so I hung up and called back. It was answered by a recorded message. I pressed 2 to speak to someone and was told that the company name is Protect My Car LLC. I am on the national do not call list. Most use this to protect themselves from unwanted calls, I use it to protect companies that want to call me, the reason being, is that my rates to take my time, is extremely expensive.

06/24/2020
Protect My Car has contacted me several times, with our my permission, in violation of the Telephone Consumer Protection Act. I have received multiple unsolicited calls on my cell phone from Protect My Car soliciting a vehicle service contract . My cell phone has been registered with the federal do not call list since 2/16/2007. Because the calls used an automated dialer, a pre-recorded message, and ignore the fact my phone is registered with the DNC, each call is in violation with multiple sections of the Telephone Consumer Protection Act (47 U.S.C. § 227). I have tried contacting the violator multiple times, without success, to try and amicably settle the matter.

02/06/2020
Robocall Practices Over the past two weeks, I have received several calls from this company concerning my automobile and attempting to sell me some kind of protection plan for it. I never opted into receiving these calls and have repeatedly asked them to stop calling. They have call in all hours of the day and have called from different phone numbers as well.

12/16/2019
Repeated call's. I have asked them to remove my name/# but they keep calling. They r disguising their # by using neighborhood scam tech w/my area code See above. Stop calling me.
Desired Outcome:
Remove my name and # and stop calling and harassing me. My next step is litigation.

10/11/2019
Multiple unwanted calls a day Multiple unwanted calls a day
Desired Outcome:
I want them to stop calling my phone from different phone numbers daily

---

[1] https://www.bbb.org/us/fl/saint-petersburg/profile/auto-service-contract-companies/protect-my-car-0653-90067737/complaints

09/13/2019
This business calls me two or three times a day trying to sell me "additonal protection" for my vehicle. I bought a used vehicle this past Tuesday and ever since this company has been calling me trying to sell me additional protection even though I have told them repeatedly that I am not interested and have asked them to remove me from their call list.
Desired Outcome:
I do not want these people calling me anymore.

### Illegal and Harassing Calls to Plaintiff

19.     Plaintiff is an individual who suffers from chronic pain and a sleep disorder, and often sleeps during the day.  At the time of the calls complained of, Plaintiff was also the trustee of several trusts and was the primary caretaker and power of attorney for his elderly parents.  In these capacities, Plaintiff was required to keep his cellphone on his person at all times so he could attend to the needs of the trusts and direct the care of his elderly parents.

20.     At all times relevant, Plaintiff's cell phone number, XXX-XXX-6577—which has been his home number since childhood, and has since several years ago, been assigned to his cellphone—has been registered to a "do not call list" maintained by the Federal Trade Commission ("FTC").

21.     Calls registered with the FTC are automatically included in the Massachusetts do-not-call list subject to the MTSA.

22.     In the days leading up to May 2, 2019, Defendant, by and through the Telemarketers, caused at least ten (10) Spoofed calls (the "Spoofed Calls") to be placed to Plaintiff's cellphone using prerecorded messages, caller-ID "spoofing" and automatic telephone dialing systems in an attempt to generate sales of VSC.

23.     At the commencement of each of the Spoofed Calls, Plaintiff's cellphone would ring, and as the Telemarketers were spoofing numbers, Plaintiff believed that he was receiving a call related to his obligations as trustee or caretaker and therefore he would answer his cellphone.

24.     Upon answering the Spoofed Calls, the same pattern would occur, to wit: there would be a pause and audible click, a delay, then a prerecorded avatar ("Avatar") would play, falsely claiming it was calling about an interest given on an unidentified website, and making a presentation offering, among other things, 50% savings on car repair bills.

25.     Although Plaintiff hung up in response to these Spoofed Calls, the Spoofed Calls relentlessly continued disturbing Plaintiff's sleep, breaking his concentration and causing him frustration, aggravation and annoyance.

26.     At no time during the Spoofed Calls did the Avatar disclose who it was or on whose behalf it was calling.

27.     Since the offending Spoofed Calls continued unabated for several weeks, Plaintiff was forced to feign interest for the sole purpose of trying to identify the offenders.

28.     On May 2, 2019, at 2:36 PM, Plaintiff received a call appearing on the caller ID display as 567-323-0701.  Upon answering, Plaintiff heard a pause and an audible click.  Thereafter the same Avatar once again falsely alleged that interest was expressed on an unidentified website and make the same offer set forth above.  In order to determine who was behind the relentless Spoofed Calls, Plaintiff stayed on the line and allowed the Avatar to continue its presentation.

29.     During the course of this call on May 2, 2019, the Avatar, like before, specifically mentioned an "Auto Springs Program."  The Avatar claimed the "Auto Springs Program" provided free roadside assistance, towing, rotation of tires, oil changes throughout the year, and specifically mentioned, among other things, an "Ambassador Program," along with specific benefits associated therewith.

30.    After making these several specific disclosures, the Avatar stated, "lets get you more information, okay." The Avatar then stated, "Great, what I can do is transfer you to one of our auto specialists..."

31.    Although the Avatar mentioned specific details of a product, at no time during the Avatar's presentation did the Avatar disclose its own identity or the identity of the party on whose behalf it was calling.

32.     Once the Avatar transferred the call, an agent answered who identified himself as "Marty McLaughlin with Protect My Car."   This is the first time the identity of Protect My Car was disclosed to Plaintiff.

33.    The agent Marty McLaughlin ("McLaughlin") disclosed the call was being recorded.

34.    McLaughlin next stated "I see we are taking a look at a 2006 Lexus."

35.    While McLaughlin was speaking, Plaintiff researched the number appearing on his caller ID display.  White Pages revealed this number being associated with "scams and fraud," with no less than 40 reports.

36.    As the call with McLaughlin continued, McLaughlin described the alleged benefits of the VSC including "mechanical breakdown coverage" in a manner consistent with what the Avatar presented in the Spoofed Calls.

37.    McLaughlin next asked several questions about the make and year of Plaintiff's vehicle, which McLaughlin claimed to be a 2006 Lexus.  As this was incorrect, McLaughlin was advised that Plaintiff had a 2004 Lexus.  Plaintiff then asked McLaughlin if Defendant was located in Massachusetts.  McLaughlin replied indicating that Defendant was "nationwide," but that he was from a "call center in Florida."

38.     McLaughlin next asked about Plaintiff's address which McLaughlin indicated was in "Fort Worth".   When it was suggested to McLaughlin that Plaintiff had never lived in Fort Worth, McLaughlin went on a ramble about how the address could have been erroneously entered in Defendant's "system" as information often gets "messed up".  McLaughlin then continued to ask questions about Plaintiff's 2004 Lexus and suggested that the vehicle qualified for Defendant's "Ambassador Elite Policy," which provided a 50% deductible on repairs—which was consistent with what the Avatar was promoting.  McLaughlin next claimed Defendant normally wanted $199 down for the policy, with 30 monthly installments of $111, but that he would try and get special discounts for Plaintiff and would get a budgeting manager on the line to provide Plaintiff with the "preferred rate".

39.     McLaughlin then transferred the call and stated to the Defendant's next agent that he had "Robert Jones" on the line, which was not Plaintiff's name.  The next agent identified himself as Jovelle Ford ("Ford") one of the managers of "PMC LLC," and stated that he was looking at the 2004 Lexus RX 330.  Ford then specifically admitted to Defendant's responsibility for the Spoofed Calls, stating in part, "[l]ooks like we been speaking with you since February."

40.     Ford next stated he would provide Plaintiff Defendant's "Exclusive 48 Monthly Term," and would reduce the down payment from $199.00 to $64.00, with recurring $64.00 per month payments for 48 months.  Ford then requested Plaintiff's credit card information.

41.     Plaintiff then asked Ford if Defendant would be emailing the policy, to which Ford stated Protect My Car would do so.  Plaintiff then provided Ford his email address.   Ford indicated that a test email would be sent to Plaintiff during the call.

42.     Ford then asked for exact miles on the 2004 Lexus RX330, as well as the VIN number.  Mistakenly, Plaintiff gave Ford the VIN number from Plaintiff's 2013 Lexus 450H.   After

receiving this information, Ford, for the first time, provided a customer service number of 844-556-4762, and stated the claims administrator for the VSC would be Protect My Car.

43.     After receiving the customer service number, Plaintiff asked Ford if Defendant could be reached back at the number appearing on Plaintiff's caller ID display, in response to which Ford stated the best number to call was the previously provided number, and then Ford provided the call center number, which was accepted, and provided as 888-692-2718.  Since no email was received, Plaintiff advised Ford of this.  Ford then provided Plaintiff an email address which was not Plaintiff's and which did not contain his name.  Ford was then provided with Plaintiff's correct email.  Ford then stated, "[y]our car is a 2013 right?"   In response, Plaintiff advised Ford it was a 2004 vehicle, at which point it was realized that the VIN from the wrong vehicle was provided as well.  Ford was further advised that the proper VIN from the 2004 would be obtained.

44.     Prior to providing Ford with the 2004 VIN, an email was received from Ford, using email address "cs@ protectmycar.com," containing a sample policy.  After receiving this, confident that those responsible for the offending calls had been identified, Plaintiff terminated the call at that juncture.

45.     Without Plaintiff ever having provided consent, or even having completed an agreement for the product offered, three (3) additional unsolicited calls were received from Plaintiff directly from Protect My Car, appearing on the caller ID display as 727-835-0246, on May 2, 2019 to wit: one at 3:14 P.M., one at 3:17 P.M., and one at 3:41 PM respectively, none of which were answered.

46.     Although it was abundantly clear during the conversation that the policy being offered was for a 2004 Lexus RX 330, and that the wrong VIN had been provided, on May 4, 2019,

Plaintiff received an email from "customerservice@protectmycar.com," stating, "[w]elcome to Protect My Car," and further stating, "[o]n behalf of Protect My Car I would like to thank you for choosing us to protect your Lexus RX 450h with an extended service contract."

47.     Upon review of his credit card transactions, Plaintiff discovered that on May 2, 2019, a charge of $64.12 was made by Defendant to Plaintiff's credit card.

48.     On May 4, 2019, Plaintiff sent Defendant a demand letter pursuant to M.G.L. c. 93A ("Demand Letter").  The Demand Letter demanded, among other things, that the offending calls immediately stop, that Protect My Car provide its do-not-call policy, that Protect My Car provide the name of the agents operating on its behalf, and Plaintiff demanded monetary damages for the offending calls.  Defendant did not respond to the Demand Letter with a reasonable offer of settlement or with a copy of its do-not-call policy.

49.     As a direct and proximate result of Defendant's aforementioned illegal telemarketing activities, Plaintiff has suffered actual harm, including but not limited to, invasion of privacy, loss of concentration, loss of productivity, loss of sleep, annoyance, aggravation, emotional distress, diminished value and utility of his cell phone and subscription services, wear and tear to his cell phone, the loss of battery charge and battery life, and per-kilowatt electricity cost required to recharge his cellular telephone as a result of increased usage of his cell phone services.

50.     In addition to the foregoing, as a direct and proximate result of Defendant's aforementioned illegal telemarketing activities, Plaintiff was forced to identify those responsible to try and get the illegal activities to cease, and in the process of doing so incurred expense in time, materials, and use of equipment.

## COUNT I
### Violations of the Massachusetts Telemarketing Solicitation Act, G.L. c. 159C

51.    The allegations of paragraphs one (1) through fifty (50) of this Complaint are realleged and incorporated by reference.

52.    The MTSA and the regulations promulgated under the authority of the MTSA impose strict pre-conditions, limitations and restrictions on unsolicited telephonic sales calls made to Massachusetts residents, and any such calls not in compliance with any of these pre-conditions, limitations and restrictions are prohibited.

53.    At all relevant times, Plaintiff was a "consumer" as defined by M.G.L. c. 159C, § 1.

54.    At all relevant times, Defendant and its agent Telemarketers were "telephone solicitors" as defined by M.G.L. c. 159C, § 1.

55.    Telephone solicitors engaging in unsolicited telephone sales calls to Massachusetts consumers are required to "properly register on an annual basis" with the Massachusetts Office of Consumer Affairs and Business Regulations (the "OCABR"). 201 C.M.R. § 12.04.

56.    At all times relevant, including but not limited to May, 2019, neither Defendant nor the Telemarketers were registered with the OCABR, as required by 201 C.M.R. § 12.04.

57.    By failing to comply with the registration requirement, Defendant and the Telemarketers failed to satisfy a basic, threshold requirement for conducting solicitations in Massachusetts and, thus violated the MTSA.

58.    The Defendant directly and through its agent Telemarketers, likewise violated the MTSA in connection with the calls complained-of herein in the following respects:

a.    By making unsolicited sales calls to Plaintiff without prior express consent or permission in violation of M.G.L. c. 159C, § 1;

b.      By calling Plaintiff after Plaintiff expressed his desire not to receive further calls, in violation of M.G.L. c. 159C, § 1;

c.      By calling Plaintiff on his Cell Phone while he was registered with the Massachusetts Do Not Call registry in violation of M.G.L. c. 159C, § 3 and 201 C.M.R. § 12.02(1);

d.      By making calls to Plaintiff without proper disclosure concerning the identity of the telemarketers and the ultimate seller in violation of M.G.L. c. 159C, § 5A and 201 C.M.R. § 12.02(7);

e.      By failing to keep and consult the Massachusetts Do Not Call registry prior to calling Plaintiff in violation of 201 C.M.R., §§ 12.04(3) and 12.02(6); and

f.      By using falsified and displaced caller identification in connection with the Spoofed Calls to Plaintiff in order to circumvent the use of caller identification services or devices in violation of M.G.L. c. 159C, § 4 and 201 C.M.R., § 12.02(5).

59.     The MTSA provides that "[a] person that receives more than 1 unsolicited telephonic sales call within a 12-month period by or on behalf of the same person or entity in violation of [c. 159C] may … bring an action to recover for actual monetary loss from such knowing violation or to receive not more than $5,000 in damages for such knowing violation, whichever is greater …"

60.     As a direct and proximate result of Defendant's violations of the MTSA and the violations of the Telemarketers for which Defendant is vicariously liable, Plaintiff has suffered actual damage as set forth above and other like and serious harm in an amount to be established at trial.

<u>**COUNT II**</u>
**Invasion of Privacy by Intrusion Upon Seclusion**

61.     The allegations of paragraphs one (1) through sixty (60) of this Complaint are realleged and incorporated by reference.

62.     The Massachusetts Privacy Act, M.G.L. c. 214, § 1B, provides, in relevant part, "a person shall have a right against unreasonable, substantial or serious interference with his privacy."

63.     A plaintiff may support a claim of invasion of privacy by showing that a defendant has intruded unreasonably upon the plaintiff's solitude or seclusion.

64.     Defendant directly, and through its agent Telemarketers, knowingly, willfully, intentionally, maliciously and without regard for the rights of Plaintiff, intruded upon Plaintiff's right to privacy by continually harassing Plaintiff with repeated calls as set forth above.

65.     Defendant's and its agent Telemarketers' calls to Plaintiff were so intrusive as to be considered "hounding the plaintiff" and "a substantial burden to his existence," thus satisfying the Restatement of Torts, Second, § 652(b) requirement for an invasion of privacy.

66.     Defendant's conduct and the conduct of their agent Telemarketers resulted in multiple invasions of Plaintiff's privacy in such a manner as would be considered highly offensive to a reasonable person.

67.     As a direct and proximate result of the invasion of privacy of Plaintiff by Defendant and its agent Telemarketers, Plaintiff has suffered the harm set forth above and other like and serious harm in an amount to be established at trial.

68.     All of the acts complained of were committed with malice, intent, wantonness and recklessness, and as such, Defendant is subject to punitive damages.

## COUNT III
### Violations of the Massachusetts Consumer Protection Act, G.L. c. 93A

69.     The allegations of paragraphs one (1) through sixty-eight (68) of this Complaint are reagged and incorporated by reference.

70.     At all times relevant, Defendant was engaged in trade or commerce in Massachusetts within the meaning of M.G.L. c. 93A §2.

71.     940 C.M.R. §3.16(3) provides that an act or practice violates M.G.L. c. 93A, §2 "if it fails to comply with existing statutes, rules, regulations, or laws, meant for the protection of the public's health, safety or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide consumers of this Commonwealth protection."

72.     The MTSA was promulgated by the Commonwealth for the protection of the consumers of the Commonwealth, including Plaintiff.

73.     Defendant's and Telemarketers' numerous violations of the MTSA (and the regulations promulgated thereunder) constitute unfair and deceptive conduct in violation of M.G.L. c. 93A, § 2.

74.     Defendant likewise engaged in unfair and deceptive conduct by willfully employing and/or contracting with the Telemarketers who Defendant either knew or should have known utilized illegal practices and methods in order to attempt to solicit Massachusetts consumers.

75.     Defendant and its agent Telemarketers further engaged in unfair and deceptive conduct by repeatedly violating Plaintiff's right to privacy.

76.     Defendant, who chose to do business in Massachusetts, knew or should have known of the requirements and prohibitions of the MTSA (and its underlying regulations), the Massachusetts Privacy Act and Massachusetts common law.  Accordingly, its violations of M.G.L. c. 93A, § 2 were willful and knowing.

77.    As a direct and proximate result of the aforementioned violations of M.G.L. c. 93A Plaintiff has suffered the harm set forth above and other like and serious harm in an amount to be established at trial.

78.    Plaintiff sent Defendant a 30-day Massachusetts Consumer Protection Act, M.G.L. c. 93A demand letter, to which Defendant failed to timely respond with a reasonable offer of settlement.

79.    As of the filing of this Complaint, Defendant's unlawful conduct in violation of the MTSA is continuing.  Said conduct, including the unsolicited, harassing and unlawful calls, as alleged herein, will continue, and will inflict further damage on Plaintiff and other consumers, unless and until this Court, or another court of competent jurisdiction, issues an injunction directing Defendant to cease and desist from said conduct and eliminates the financial incentive for this unlawful conduct by ordering Defendant to disgorge all profits generated from its illegal telemarketing activities.

80.    Accordingly, while monetary damages may be sufficient to compensate Plaintiff for past violations, injunctive relief is necessary in order to stop Defendant's unlawful course of conduct from continuing.

        **WHEREFORE**, as to all Counts, the Plaintiff requests that this Court:

1.    Enter judgment for the Plaintiff against the Defendant;

2.    Award Plaintiff his actual, compensatory, punitive and special damages to be determined at trial;

3.    Find that the Defendant is vicariously liable for the actions and omissions of its agent Telemarketers complained of herein;

4.      Find that the Defendant and its agent Telemarketers violated the MTSA, and award Plaintiff statutory damages of not less than $5,000.00 for each violation;

5.      Find that Defendant and their agent Telemarketers' actions complained of were willful, knowing, intentional, unfair, and deceptive, in violation of M.G.L. c. 93A and award Plaintiff treble damages;

6.      Award Plaintiff his reasonable costs, expert fees, attorney fees and expenses;

7.      Issue a **permanent injunction**, enjoining Defendant from further violations of the MTSA and conducting telemarketing in Massachusetts with unregistered telemarketers;

8.       Order disgorgement of all Defendant's ill-gotten profits; and

9.      Award Plaintiff pre-judgment interest and such other and further relief as Plaintiff may be entitled at law or in equity.

**PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY OF ALL CLAIMS SO TRIABLE**

Respectfully Submitted,

Robert A. Doane,

By his Attorney,


/s/RICHARD B. REILING
RICHARD B. REILING BBO#629203
BOTTONE | REILING
63 Atlantic Street, 3rd FL
Boston, MA 02110
Phone: (617) 412-4291
Facsimile: (617) 412-4406
Email: richard@bottonereiling.com